06/14/07 DRAFT – NOT FOR PUBLICATION
PRIVILEGED ATTORNEY-CLIENT COMMUNICATION

OFFICE OF PROFESSIONAL ACCOUNTABILITY
REVIEW BOARD

SPECIAL REPORT:
OPA'S INVESTIGATION INTO THE ARREST OF GEORGE T. PATTERSON[1]

I. Summary

In late March local news media launched a series of investigative reports into the nighttime drug arrest of wheelchair-bound paraplegic George T. Patterson by two Seattle police officers, on January 2, 2007.[2] Mr. Patterson posted bail bond for his release the following day, and personally filed a complaint two days later against both officers with the Office of Professional Accountability (OPA) in the Seattle Police Department (SPD). At Mr. Patterson's urging, the OPA Sergeant assigned to investigate his complaint recovered video footage of the encounter from a Walgreens store security camera. Discrepancies between the officers' sworn arrest statements and the video prompted the King County Prosecutor to move to dismiss the criminal case against Mr. Patterson by early March, and so-called "Brady" notices were subsequently issued to defense counsel in numerous other municipal, state, and federal criminal proceedings involving the same two officers.

OPA had apparently just completed its investigation on April 9 when the Chief of Police issued a Press Statement that minimized the officers' conduct while imposing unspecified discipline for failing to follow arrest procedures, simultaneously refusing to "…apologize for making arrests and seizing narcotics and illegal firearms."[3] The OPA Review Board[4] requested OPA's closed investigative files on May 10 and again on May 16, seeking to reconcile the Chief's and prosecutors' apparently conflicting views of the officers' conduct. Subsequently, concerns about the officers' conduct from OPA Auditor Katrina Pflaumer and King County Superior Court Judge Catherine Shaffer were reported, and the FBI commenced its own investigation into the matter.[5]

---

[1] OPA-IS Case No. 07-0013 ("Case"). All references are to the hand-numbered pages of the closed, unredacted OPA case file as provided to the Board on May 23, 2007 (e.g., "Case at 1").
[2] See, e.g., Castro, Hector, "Investigation of officers leads to dropped drug charges", Seattle Post-Intelligencer, 29 March 2007 <http://seattlepi.nwsource.com/local/309411_cops29.html>; Martin, Jonathan, "Questions in drug bust may derail cases", Seattle Times, 29 March 2007 <http://archives.seattletimes.nwsource.com/cgi-bin/texis.cgi/web/vortex/display?slug=webpolice29m&date=20070329&query=questions+in+drug+bust+may+derail+case>.
[3] SPD Press Statement dated April 9, 2007 ("Press Statement"), at 2. The Press Statement is attached as Exhibit A.
[4] For background information on the Board, its mission, and its current members, please see Appendix A, "About the OPA Review Board".
[5] Carter, Mike, "2 officers' reports on arrest questioned", Seattle Times, 12 May 2007 <http://archives.seattletimes.nwsource.com/cgi-bin/texis.cgi/web/vortex/display?slug=officers12m&date=20070512&query=judge+shaffer> ;Carter, Mike,

On May 23, after nearly two-week's delay, the Board received OPA's closed, unredacted files on Mr. Patterson's arrest. Board member Bradley Moericke and Board chair Peter Holmes independently reviewed OPA's closed files before collaborating to prepare this report. Board member Sheley Secrest previously recused herself from substantive deliberations in this matter due to a potential conflict of interest.

We reach the following central conclusions in this matter:

> A. Excellent investigative work by OPA from the outset of this case led to (1) dismissal of criminal charges against Mr. Patterson and (2) issuance of Brady notices in other proceedings involving the named officers, simultaneously (3) exposing inadequate supervision of West Precinct bicycle patrol squads.
>
> B. The Chief of Police subsequently intervened in OPA's open investigation, directing extraordinary measures to obtain the testimony of a previously uncooperative, unreliable witness to (1) bolster part of the officers' inconsistent testimony and (2) discredit the complainant and another independent witness. We have never reviewed a sustained OPA complaint which relied upon such questionable evidence to resolve credibility issues.
>
> C. The Chief's April 9, 2007, Press Statement, apparently issued in lieu of a final proposed disposition certified by the Acting OPA Director, is not fully supported by the facts uncovered in OPA's investigation.

A serious conflict implicating Seattle's public safety remains unresolved: The same allegations of police misconduct that compelled prosecutors to dismiss criminal charges against Mr. Patterson and issue Brady notices in related matters have been publicly sanctioned by the Chief of Police. The Chief further appears to ignore evidence uncovered by OPA indicating broader, at best perfunctory compliance with arrest screening procedures. Unless and until current SPD leadership addresses the very real problems revealed by this investigation, recurring misconduct is likely, leading to a decline of public confidence in the Department.

## II. OPA's Investigation

Single arrests not involving shootings, vehicle pursuits or other dramatic storylines seldom generate the level of media attention that has followed the arrest of George

---

"Cops lied, hindered probe, says watchdog", Seattle Times, 24 May 2007 <http://archives.seattletimes.nwsource.com/cgi-bin/texis.cgi/web/vortex/display?slug=copauditor24m&date=20070524&query=Pflaumer>; Sullivan, Jennifer, "FBI probes disputed drug arrest by Seattle officers", 23 May 2007 http://archives.seattletimes.nwsource.com/cgi-bin/texis.cgi/web/vortex/display?slug=fbi23m&date=20070523&source=g>. Previously lost emails between the OPA Auditor and the Chief regarding this matter have been recovered, and the Board has just received copies these emails from the new OPA Director (on Thursday, June 14, 2007).

Patterson. The fact that a video camera caught most if not all of the important details of the arrest is rare even in this post-Patriot Act age of increasing video surveillance. This case is unusual, too, in that much of OPA's investigation took place during a vacancy in the office of the civilian OPA Director. It is also among the first cases reviewed by the OPA Review Board unencumbered by the confusing and burdensome redaction of witness identities. And the very public disconnect between the Chief of Police and prosecutors makes this matter ripe for review by the Board.[6]

Once we had obtained OPA's closed case file, another important fact quickly emerged which further distinguishes this matter: Unlike the hundreds of other closed OPA cases reviewed by the Board since its inception, OPA-IS Case No. 07-0013 lacks a final proposed disposition certified by any command staff or the Acting OPA Director. The next closest documents we found are the Acting OPA Captain's draft, unsigned disposition memorandum and the Chief's Press Statement—both dated April 9, 2007. We believe that the key to understanding this investigation lies in comparing these two documents in light of the evidence gathered by OPA. We start with the five underlying misconduct allegations, and examine how events during the investigation itself unfolded to transform this case into an exceptionally revealing snapshot of civilian oversight and police accountability in the SPD today.

### A. Complainant's Allegations

One day into the New Year, on **January 2, 2007**, at around 10:15 pm, George Troy Patterson was arrested at the Walgreens store on the corner of Third and Pike and charged with a violation of the Uniform Controlled Substances Act (VUCSA)[7] by two Seattle police officers. Mr. Patterson posted $7,500 bail bond the following day, and was released. Two days later, on **January 5**, Mr. Patterson appeared in person at OPA offices in SPD Headquarters and filed a complaint against both officers, alleging that they (1) used Unnecessary Force both in effecting his arrest and again at the West Precinct, and (2) lied about recovering drugs from his person (Honesty). When interviewed by telephone on **January 18**, Mr. Patterson urged the assigned OPA Sergeant to seek out Walgreens' security surveillance video, believing it had captured the encounter.[8]

### B. OPA's Additional Allegations

The OPA Sergeant promptly requested the Walgreens video. When he finally obtained the recording on **January 29**, the OPA Sergeant discovered that the two named officers had already detained and handcuffed another male individual (the "First Witness") prior to contacting Mr. Patterson—a fact not disclosed in the officers' arrest reports. The video further reveals a female (the "Second Witness") who later engaged Mr. Patterson and the officers in conversation, often at very close quarters. After reviewing the video and subsequent witness statements, OPA eventually added new

---

[6] The Board published its reasons and authority for requesting this case in a document attached to the May 25, 2007, press release, attached in turn to Appendix A.
[7] Chapter 69.50, Revised Code of Washington.
[8] Case at 252.

allegations, including (3) Failure to Follow Arrest Procedures (as to both the First Witness and Mr. Patterson);[9] (4) Mishandling Property or Evidence (against one of the named officers, for allegedly pocketing a dime bag of marijuana confiscated from the First Witness), and (5) Failure to Cooperate with OPA Investigation, by rendering incomplete or inaccurate statements.[10]

### C. OPA Notifies the King County Prosecutor

OPA provided Mr. Patterson's prosecutor with a copy of the video on **January 31**. The King County Prosecutor thereafter moved the King County Superior Court on **March 6** to dismiss the criminal case against Mr. Patterson "in the interest of justice."[11] Local and federal prosecutors also subsequently decided to issue "Brady notices"[12] in other pending criminal matters where the two named officers were potential witnesses. And though OPA was not the source,[13] stories about the prosecutors' actions first appeared in the *Seattle Times* and *Seattle Post-Intelligencer* newspapers on **March 29**.[14]

That OPA effectively spotted additional issues during its investigation is reassuring; and as discussed in the next section, OPA is also to be commended for promptly notifying the King County Prosecutor about its early findings.[15] Unfortunately, due to the Chief's reaction to the ensuing media attention, we cannot know with certainty how OPA would have ultimately resolved each allegation before the matter was certified to the Chief for discipline.[16]

### III. The Chief Intervenes in OPA's Investigation

As noted above, newspaper accounts of the OPA investigation, Mr. Patterson's dismissal, and the related Brady notices first appeared on **Thursday, March 29**. The following **Monday, April 2**, Chief Kerlikowske viewed the Walgreens video and toured the arrest scene for himself.[17] Also on April 2, the assigned OPA Sergeant submitted his

---

[9] OPA's interest in both subjects' screening procedures is important: Although OPA wanted to determine why no attempt was made to screen the First Witness's detention (even though he had been handcuffed), Mr. Patterson's cursory screening by an unofficial "acting" sergeant indicated that squad members were effectively "screening" each other's arrests, without the supervision of "hard stripe" sergeants. See, e.g., Case at 306; 319-321; 372.

[10] Case at 122.

[11] Case at 161.

[12] In *Maryland v. Brady*, 373 U.S. 83 (1963), the U.S. Supreme Court ruled that prosecutors, in criminal cases, have an affirmative duty to disclose potentially exculpatory evidence—including evidence weighing on the credibility of the prosecutions' witnesses.

[13] Case at 85.

[14] See fn 2, infra.

[15] This action was approved by the OPA-IS Lieutenant, with concurrences by the OPA-IS Commander, the Department's legal advisor, and the previous OPA Director—apparently her last official act with respect to this case. Case at 115.

[16] For a complete analysis of each allegation and the relevant evidence gathered by OPA, see attached Appendix B. Notably absent from the Acting Captain's draft disposition memorandum are any concurrences by the named officers' command staff.

[17] Case at 124.

case file to the OPA Lieutenant/Acting Captain for review.[18] Although OPA files are not readily available for review by the general public, the Chief's April 9 Press Statement referenced the Department's "extensive investigation"[19] into the Patterson matter and focused on specific evidence that, in the Chief's view, largely exonerated his officers:

> An independent witness describing Mr. Patterson as her "dope dealer," observed the arrest and stated that officers were restrained in the way they handled Mr. Patterson. The witness also states that she observed Mr. Patterson with the narcotics that the officers recovered. The witness also told investigators that Mr. Patterson had left her with a message asking her to accuse the officers of planting the narcotics.[20]

This "independent witness" is the Second Witness captured by the Walgreen video. As discussed below, however, her testimony does not appear to be especially reliable.

### A. Chief directs extraordinary measures to obtain Second Witness's statement

Mr. Patterson had already tried to identify the Second Witness at the outset, and thereafter attempted to contact her—as instructed by the assigned OPA Sergeant—to assist in OPA's investigation. The file also reflects many efforts by the assigned OPA Sergeant to contact the Second Witness. Finally—on April 4—the Second Witness was herself arrested on VUCSA charges, and the assigned OPA Sergeant and a second investigator promptly contacted her in a West Precinct holding cell. This is how the assigned OPA Sergeant describes the exchange:

> ... [Second Witness] told me that she was at the Walgreens on 1-2-07 and she witnessed the interaction between the Officers and Mr. Patterson. I confirmed her identity from the still video photos taken during the incident. [Second Witness] also confirmed that she received multiple phone messages from me but that she did not want to call me back as she did not want to become involved in this incident or an altercation. *[Second Witness] indicated that she would only give me a statement tonight if we could release her on the drug arrest...she indicated that she did not want to go to jail.*
>
> *I advised [Second Witness] that we could not drop the charges as a trade for her statement and asked if she would give a voluntary statement. She said she*

---

[18] Id.

[19] The Press Statement reports that the Department has "reviewed every individual case that [the named officers] have been involved in since the beginning of the year, including cases pending prosecution...[and] have found nothing in our review that would lead to further investigation." Assuming that is true, none of these other case reviews were included in the closed investigative file we reviewed for OPA-IS 07-0013. Moreover, considering that Mr. Patterson was arrested on just the second day of the New Year, a single day's retrospective hardly qualifies as "extensive". Because the SPD Manual provides for automatic administrative reviews for any officer receiving three or more investigated complaints in a year, or four or more investigated complaints over two years (§1.117.VIII.A), the Board's May 16 letter also requested a list of all other OPA cases involving the named officers for the past 24 months, which the new OPA Director hand delivered to Mr. Holmes on May 31.

[20] Press Statement at 1.

*would not.* I advised her that she would be booked on the original drug charge but that I would make contact with her at the King County jail the next day and she said she would see me then. I paged [the Acting Captain] to advise him of this development but when I could not make contact I notified [the Acting OPA Director]. *[The Acting OPA Director] agreed with me that we should not trade her release for a statement.*[21]

Following this unsuccessful attempt to obtain a voluntary statement from the Second Witness, the Acting OPA Director called the assigned OPA Sergeant at home later that same night. He asked for the Second Witness's full name, explaining that he was the night's Duty Captain, and planned to ask another OPA sergeant to make a second interview attempt.[22] Contrary to the Acting OPA Director's prior resolve, the Second Witness was in fact released that very night from the King County Jail in exchange for her statement in OPA's Patterson investigation:

[OPA sergeant]: Now, Ms. [Second Witness], before we get started, you're here giving this statement tonight and myself and [Acting OPA Director] had visited you at King County Jail and had you released from that facility, is that correct?

[Second Witness]: That is correct.

[OPA sergeant]: And what is your understanding of what your obligation was for us to release you?

[Second Witness]: I have no obligation.

[OPA sergeant]: Other than to provide this statement, is that correct?

[Second Witness]: Other than to provide this statement, that is correct.[23]

An email from the Acting Captain to Chief Kerlikowske the following morning confirms that these extraordinary measures were implemented at the Chief's direction. His **April 5** "CASE UPDATE" to Chief Kerlikowske recounts that the acting OPA Director

has already briefed you about the developments of locating [the Second Witness], who was seen in the video. *At your direction,* an OPA-IS investigator was sent to the King County Jail and obtained an interview.[24]

Just four days later—a date handwritten to coincide with the Chief's April 9 Press Statement—the acting OPA Captain would further state that the *"pendulum swings* in the officer's [sic] direction with the introduction of yet a *second* witness to the events."[25]

---

[21] Case at 125 (emphasis supplied).
[22] Case at 124-5.
[23] Case at 280.
[24] Case at 90 (emphasis supplied).

## B. Questionable Probity of the Second Witness's Statement[26]

As noted above, the Second Witness was arrested, released from jail (without having to post bond)[27] and interviewed by OPA sergeants, all on **Wednesday, April 4**. By the following **Monday, April 9**, her statement had apparently caused the "pendulum to swing" in the officers' favor, bringing OPA's investigation to a close—at least according to the Acting OPA Captain's draft proposed disposition memorandum. The Chief places even greater weight on the Second Witness's statement—calling her "independent" and using her to cast the complainant as a "dope dealer" whom the officers handled with "restraint"—and that the complainant had even "left [the Second Witness] a message asking her to accuse the officers of planting the narcotics."[28] An examination of her full statement and her activities in the video, however, together with the circumstances under which her statement was obtained, call into question the Second Witness's veracity and motivation, not to mention her ability to perceive, recall, and relate accurate facts—even for the limited purpose her testimony served in clearing the officers of the unnecessary force and dishonesty allegations.

According to the Chief, the Second Witness "told investigators that she observed Mr. Patterson with the narcotics that the officers recovered." The Second Witness actually testified as follows:

> [Second Witness]: I seen Mr. Patterson throw something out of his mouth but I don't know what it was. I mean when he was down like this, I seen something come out of his mouth, but I don't know what it was.
>
> [OPA sergeant]: Okay.
>
> {Second Witness}: 'Cause I'm busy looking at all the action, the lights and everything of that nature, but when the officer reached down and he came back up and he said oh, what is this, Mr. Patterson, it looks like a cocaine rock and it was in a plastic bag. That's what I seen.[29]

The officers, however, stated that crumbs of crack cocaine were immediately recovered from Mr. Patterson's clothing—and that none was recovered from his mouth or in a plastic bag—before the Second Witness had even arrived on the scene.[30] None of these

---

[25] Case at 9 (emphasis in original).

[26] While most of the pertinent facts in this matter are widely disseminated in the press, we have had the advantage for the first time in the Board's history of reviewing complete and unredacted copies of OPA's closed files in this matter. This has enabled us to determine how critical this witness's "testimony" was to the Chief's conclusions. That City Council thus helped make the OPA process more transparent in the OPA Ordinance amendments it adopted last year is underscored by this case.

[27] By contrast, Mr. Patterson spent a night in jail before obtaining a $7,500 bail bond to gain his release on an identical "VUCSA" booking charge.

[28] Press Statement at 1.

[29] Case at 286.

[30] Case at 352; 413.

inconsistencies are reported in the Press Statement, leaving instead the inaccurate impression that the Second Witness corroborated the officers' stories.

The Second Witness's unreliable perception and memory is perhaps best demonstrated by the fact that she has no recollection of the First Witness—the 6'5", 340 pound African-American man who stood in handcuffs next to her throughout the entire incident.[31] Any lingering doubts about the unreliability of the Second Witness's testimony should have been put to rest by her own disclaimer:

> ...At this time I'm intoxicated to a point and I'm asking Mr. Patterson where is the car, where is the car, because he had purchased my car. Give me the keys to your keys to your car and give me your money and I'll show up to court with you and I'll advocate for you. But that was a way for me to obviously drive around in my car again and spend Mr. Patterson's money.[32]

In the hundreds of cases reviewed by this Board, this much is clear: No complaint against any Seattle police officer has ever been sustained on the basis of such unreliable testimony.

## C. Resolving Credibility Issues: The "He Said, She Said" Dilemma[33]

### 1. The First Witness

In contrast with his treatment of the Second Witness's testimony, the Chief points only briefly to "another suspect"—the First Witness—who figures prominently in the Walgreens video. Out of all the allegations raised by Mr. Patterson and OPA, the Chief chose to impose discipline only for the officers' obvious failure to screen the First Witness's detention. In doing so, the Chief effectively sidesteps the fact that OPA charged the named officers with *two* counts of Failing to Follow Arrest Procedures: the First Witness's wholly unreported detention *and* Mr. Patterson's improperly "screened" arrest.

In much the same manner as the officers failed to notify their supervisors about the First Witness, the Chief omits mention of the testimony the First Witness provided to the OPA investigators—which largely corroborates Mr. Patterson's testimony. Unlike the

---

[31] Id. at 286-287 (Second Witness statement at 7-8).

[32] Case at 282. Mr. Patterson acknowledged in his recorded statement that the Second Witness attempted to obtain his vehicle keys and money and told her (and the arresting officers) that "I aint got my car, 'cuz my car had been stolen for like three weeks before that, this incident." Case at 238. Apparently testing every aspect of his credibility at the end of its investigation, OPA confirmed by Department records that Mr. Patterson had indeed reported a stolen vehicle just two weeks earlier. SPD Incident #06-534832, dated December 18, 2006.

[33] OPARB has previously recommended that OPA develop guidelines for objectively weighing civilian-officer credibility contests. See OPARB Final YE 2003 Report at 14-16. Moreover, as suggested by academics in the field of police accountability, the ability to hear actual recordings of witness interviews rather than having to rely solely on interview transcripts can facilitate the oversight function. We intend to explore access to these recordings with OPA for future reports.

officers' or the Second Witness's testimony, the First Witness's testimony is consistent with the video. For instance, the First Witness estimated that officers removed his handcuffs approximately 20 minutes after Mr. Patterson's initial detention; the video confirms that this took place after 18 minutes.[34] The First Witness did not file an OPA complaint, did not know Mr. Patterson or the Second Witness,[35] presumably did not see the Walgreens video, and was not defending against criminal prosecution himself. He simply responded to the OPA Sergeant's questions with apparently nothing to gain, and even credibly described (despite the natural instinct against self-incrimination) the confiscation of a "dime bag" of marijuana which was never reported by the officers.[36]

The video plainly shows a "counter-joint" pain compliance technique—i.e., bending the fingers and thumb backwards—being applied by one of the officers to Mr. Patterson's left arm, which neither officer mentions in the arrest reports;[37] deny during their first OPA interviews; and stumble over during their follow-up interviews—after viewing the video.[38] The Second Witness never saw any force applied to Mr. Patterson's left arm at all. In contrast with these three witnesses, and consistently with both the video and Mr. Patterson, the First Witness testified in regard to the Unnecessary Force allegation that:

> I think one of them, I think the guy had like gloves on, the cop, and he started like messing with his fingers like, you know, bending his fingers ways they couldn't be bent. And I'm just looking there like, wow, they really doing this guy dirty. Like if I get done like this, it's over, my God, you know, and they's just like a shame.[39]

We do not challenge the ultimate determination of Exonerated with respect to Mr. Patterson's Unnecessary Force allegation—or, for that matter, any other determination against the officers. We do not, however, understand the Chief's reliance upon the Second Witness's opinion that the "officers were restrained in the way that they handled Mr. Patterson."[40] It is indeed a shame that the Department apparently has not yet developed common sense guidelines as previously recommended by OPARB to assist in

---

[34] Case at 265.

[35] The First Witness even corroborates the Second Witness's admission that she was trying to get Mr. Patterson's car and money ("I guess she want to take his stuff off him and get high."), Case at 260; by contrast, the Second Witness had no recollection that the First Witness was even present.

[36] Case at 259.

[37] Even if this force was appropriate, use of the pain compliance technique probably should have been reported in the officers' arrest reports and in a separate Use of Force Statement—as provided in the SPD Manual (§1.145) and previously recommended by the Board. See OPARB's YE 2003 Final Report at 3-8.

[38] The OPA Lt/Acting Captain was not impressed by the officers' testimony:

> [Officer II]'s denial of using a gooseneck type hold on Subject Patterson comes across as a minimization of what can be seen on the video. [Officer II] would have us believe he was merely holding onto the subject, not applying any force. Subject Patterson states his hand was in pain, as he was being held there for over 4 minutes before he was handcuffed. In any case, it appears the subject was seated in a wheelchair in a very compromising position. One officer was holding his left arm back, while the other ([Officer I]) was controlling him, pushing him forward by leveraging his head/face. The video speaks for itself.

Case at 10.

[39] Case at 265.

[40] Press Statement at 1.

the evaluation of conflicting testimony.[41] The result in this matter provides fodder for those who argue that internal police accountability systems inevitably give police officers the benefit of the doubt in credibility contests.

### 2. The Complainant, Mr. Patterson

"Dope dealer"[42] or not, Mr. Patterson behaved throughout this investigation like an innocent man—at least at the time of his arrest on January 2. He secured a bail bond and promptly filed a complaint, in person, after his arrest. He cooperated fully with OPA investigators, following up even to help obtain the Second Witness's testimony as instructed by the assigned OPA Sergeant. And while Mr. Patterson must also be credited with pointing out to investigators the existence of Walgreens' video camera, we think that this same act also highlights his own credibility.

On January 5, the date he complained to OPA, Mr. Patterson probably did not know that the officers had failed to mention the First Witness in their arrest reports, the most obvious flaw revealed by the video. Mr. Patterson presumably also hadn't seen the video for himself. In urging investigators to secure the unseen video, Mr. Patterson thus behaves as a man who *knows* he is innocent. At a minimum, Mr. Patterson's insistence that OPA investigators review the video reflects his confidence that it would not substantiate the officers' VUCSA claims, even if the video failed to prove his innocence conclusively.

Rather than weighing Mr. Patterson's testimony in this light, the Chief instead treats it in the most cynical and disingenuous way possible: He accuses Mr. Patterson of witness tampering.[43] Keep in mind that the assigned OPA Sergeant *had asked Mr. Patterson to contact the Second Witness*, and that she, in turn, admitted telling Mr. Patterson that she would show up to court and "advocate" for him if he gave her his money and car keys—which Mr. Patterson refused to do. The Second Witness's actual statements thus do not support the Chief's accusation that Mr. Patterson attempted to obtain false testimony from her:

[OPA]: Now *since* this incident has occurred... [emphasis in original]

[SECOND WITNESS]: Um hmm.

[OPA]: ...have you talked to Mr. Patterson?

[SECOND WITNESS]: No, sir. Oh! One time.

[OPA]: Did he tell you anything about what had happened that night?

---

[41] OPARB YE 2003 Final Report at 14-16.

[42] Press Statement at 1.

[43] Id. ("The [Second W]itness also told investigators that Mr. Patterson had left her a message asking her to accuse the officers of planting the narcotics.")

> [SECOND WITNESS]: *No, sir. He said that he needed me to show up in court on his behalf and I let him speak to my significant other and we tried to explain to him that he was out of pocket, number one) for even giving SPD my telephone number without my permission, and number two) that there was legal resources that could help him work this situation out, but we didn't think it was appropriate for him to be calling, asking me to work it out, more specifically, giving {assigned OPA sergeant} my telephone number. We, we considered that to be very inappropriate. And disrespectful.*
>
> [OPA]: Did he ever make any allegations to you that the officers planted dope on him?
>
> [SECOND WITNESS]: Yes, sir, he did.
>
> [OPA]: And when was that?
>
> [SECOND WITNESS]: On that telephone call that he...he actually left a voicemail message indicating that the Seattle Police Department planted dope on him *and that I seen them plant dope on, on him and that I needed to show up to court to testify against the officers for planting dope on him.* And then he called back and expressed that same temperament to myself and I was so overwhelmed by his conversation and so afraid that I allowed my significant other to speak to him on the phone, which he reprimanded him and admonished him not to call us again...[44]

That the interviewer kept asking until he got the answer he wanted is plain from the transcript. Moreover, the day after the Second Witness gave this late night statement, the (original) assigned OPA Sergeant was apparently directed to go to the Second Witness' residence, only to discover that she had not saved the voicemail message referenced in her statement.[45]

The Chief thus appears to make more of the Second Witness's solicited testimony than is warranted. He implicitly assumes, moreover, that the officers did *not* plant drugs on Mr. Patterson. Yet this is the very crux of Mr. Patterson's complaint, as well as his defense to VUCSA charges: He didn't have any drugs when detained by the officers, so the complainant concludes without necessarily witnessing the act that the officers must have planted the drugs. His shorthand for the incident itself becomes "the cops planted dope on me"—an apposition, in other words, rather than suggested testimony to be adopted by another. Asserting that Mr. Patterson tried to persuade the Second Witness to file false charges against the officers—especially since the OPA Sergeant had asked him to contact her—comes off to us as a strained reach to vindicate the officers rather than an objective sifting of facts. Public confidence in the OPA accountability system suffers as a result.

---

[44] Id. at 288 (emphasis supplied).
[45] Case at 126.

From an April 10 email by the Acting OPA Captain to the Chief summarizing the complainant's criminal history, moreover, it appears that a criminal background check was also performed on Mr. Patterson late in the investigation, using the Washington Criminal Information Center (WACIC).[46] No similar inquiries or emphasis was placed on the Second Witness' criminal history, despite the fact that she had been arrested for the very same offense (VUCSA) as the complainant, on the very day she provided her statement. When one witness is subjected to more such scrutiny than another, the fact finder's objectivity is compromised, along with the appearance of fairness and impartiality.

## IV. Conclusions & Recommendations

### A. The civilian OPA Director's investigative/adjudicative/administrative function must be kept separate from the Chief's final disciplinary decision making.

The 1999 Final Report of the blue ribbon panel that led to OPA's creation was clear: In exchange for the continued privilege of policing themselves—cops investigating cops; the Top Cop having the final word—Seattle police would be directed in the investigations of civilian complaints of misconduct by a qualified civilian. According to the Citizens Review Panel,

> The [OPA] Director would oversee and be responsible for the investigative, adjudicative and administrative functions of the disciplinary process, and would recommend disciplinary actions to the Chief of Police. The Chief would be solely responsible for the final determinations as to discipline, and *may for good cause and in writing*[47], *modify the adjudicative findings of the Director.*

The Panel also admonished the Chief to set the standard:

> The message of integrity and personal responsibility must start with the Chief of Police and be expected at every level below.[48]

Until the Second Witness's April 4 interview—at the Chief's direction—OPA appeared to be on a path to sustaining the more serious allegation regarding the named officers' truthfulness in the OPA investigation.[49] Even as late as April 6, the Acting

---

[46] OPARB has previously criticized criminal background checks on complainants by OPA. See OPARB's YE 2003 Final Report at 9-10. The OPA Director subsequently determined that requesting criminal histories for purposes of an administrative investigation (as opposed to a criminal investigation or prosecution) is illegal.

[47] We have previously recommended that Chief Kerlikowske honor this written requirement, see OPARB FY 2003 Final Report at 17, and are presently holding a draft report devoted exclusively to the issue.

[48] OPARB YE 2003 Final Report at 5.

[49] While OPA's investigation was generally excellent, with the benefit of hindsight, lessons can be learned from gaps—especially in interviews—for even better investigative results. We have attempted to list examples of investigative gaps in this matter in Appendix C.

It must be remembered that OPA raised *two* counts of Failure to Follow Arrest Procedures: One for wholly failing to inform supervisors about detaining and handcuffing the First Witness, the second for improperly screening Mr. Patterson's arrest. The OPA Lieutenant/Acting Captain recommended Sustained findings on both counts, but the Chief's Press Statement expressly provides only that unspecified discipline would be imposed on the first count.[53] Although the second count targets the potentially broader supervisory problem, the Press Statement makes it appear that the Department has abandoned this allegation altogether. We are more concerned about the broader implications—a lack of supervision allowing police power to operate unchecked—rather than the named officers' actions in this particular matter.

The Chief thus appears to have tacitly approved a supervisory screening process at the West Precinct that is perfunctory at best. Unless meaningful screening procedures are insisted upon from the "top down", misconduct such as that uncovered by OPA in this case will likely reoccur. Although OPA appeared to be ferreting out the problem before news reports began to eclipse the investigative process, an independent commission may be necessary to truly assess the extent of the problem. We recommend that the Chief be required to establish such a body to report to him and the City Council, to operate without interference from the Chief.

### VII. Epilogue

We must stress what went right in this matter: OPA promptly uncovered important facts and properly alerted the King County Prosecutor about serious inconsistencies in the officers' sworn reports. The assigned OPA Sergeant in particular is to be commended for the thoroughness of his investigation, the care taken and expertise exhibited in his interviews, and his dogged determination to be thorough.

An important lesson can also be taken away at the end: That the Chief was apparently able to intervene during a vacancy in the office of the OPA Director actually speaks to us about the wisdom of Seattle's police accountability model. Our own ability to review this matter, moreover, speaks to the wisdom of City Council's amendments last year, which enabled us to request unredacted cases for more timely review. With active, qualified civilian oversight, we continue to believe that Seattle police remain the best resource for investigating complaints against their own. We cannot help but conclude, however, that this Chief took advantage of the vacancy in the OPA Director's office, requiring legislation to correct.[54]

---

[53] "In the course of the internal investigation it was shown that [the officers] temporarily detained another suspect on a warrant in a completely unrelated stop. The detained suspect was then released. *This detention was not documented as required by the Seattle Police Department's Policies and Procedures. Both officers have accepted full responsibility for this administrative violation and I will impose disciplinary action."* Press Statement at 1 (emphasis supplied).

15

We owe it to the *majority* of the Seattle police officers who have received no complaints whatsoever in the course of carrying out their duties, to make certain that OPA is permitted to do a thorough and independent fact-finding job with the complaints that are filed. This Board remains committed to three key components of an effective police accountability system in Seattle. The first of these are that (1) allegations of police misconduct are best investigated by trained police officers; and (2) the Chief should retain final authority to render discipline. This case, however, underscores the need for the third and final component: effective civilian oversight of the investigation process. Unless and until top leadership—the Chief of Police, especially—fully embrace this third component of civilian oversight, Seattle police may very well lose the privilege of policing themselves.

Ultimately, unless Seattle City Government requires police officers to use proper law enforcement procedures, Seattle City Government will be responsible when those officers begin to take the place of prosecutors, judges and juries. Instead of faithfully gathering and recording evidence of criminal behavior to be evaluated in the criminal justice system, cynical cops will be tempted to take shortcuts. It becomes easier to for them to simply decide who's a criminal and report "facts" sufficient for a prosecutor to shepherd in good faith before triers of fact who—like most of us—would like to believe the testimony of their sworn officers. Unless the Department embraces both professional police practices and transparent accountability, we will end up having neither.